KELLER *v*. McCONVILLE.

1. GIFTS—INTER VIVOS.

A gift made with the intent that it shall take effect immediately and irrevocably, and fully executed by a complete and unconditional delivery, is good and valid as a gift *inter vivos*, although at the time the donor is *in extremis* and dies soon after; it is a gift *causa mortis* if the donor makes the same conditional upon his death.

2. SAME—UNDUE INFLUENCE—COMPETENCY.

Evidence in a suit to set aside transfers made by decedent to his brother considered and *held* not to establish undue influence or incompetency of the donor.

3. SAME.

A delivery actual, constructive, or symbolical, is essential to the validity of either kind of gift.[1]

4. SAME—CONDITIONS—TRUSTS.

Where decedent transferred all his property to his brother in anticipation of death, and either at the time of executing the conveyances or at a later date, made a written request to his brother to pay certain sums and transfer certain property to other relatives, expressing his desire by saying "it is my wish, when things are straightened out, and you are to take your own time about it, that you make these gifts," etc., the request was of an optional character and not being a clearly expressed condition it did not have the effect of creating a trust.

5. MORTGAGES—ASSIGNMENT—PERSONAL PROPERTY—DEED GIVEN AS SECURITY.

In a transaction involving a loan of money by decedent who took a deed of real property as security, and gave a land contract back to the grantors, decedent's right or interest was in the nature of personal property, transferable by assignment.

6. GIFTS—EVIDENCE—ADMISSIONS.

Declarations of a donor, constituting admissions against

---

[1] On the question of the sufficiency of constructive delivery to sustain gift *causa mortis*, see note in 18 L. R. A. 170.

interest made subsequent to the gift, are admissible against his estate as tending to show that he had given the property to the donee.

7. SAME.

It will not nullify a gift of property that the donor so disposed of it as to work an apparent injustice to some of his relatives; courts are not permitted to make equitable distribution of estates.

Appeal from Wayne; Donovan, J. Submitted April 24, 1913. (Docket No. 28.) Decided May 28, 1913.

Bill by Rose Hannah Brooks individually and as administratrix of the estate of William McConville, deceased, against John McConville and another to set aside certain deeds or conveyances of deceased. After the death of Rose Hannah Brooks, Robert Keller, as administrator *de bonis non,* was substituted as party complainant. From a decree for defendants, complainant appeals. Affirmed.

*Scott, Moran & Stafford (Guy A. Miller,* of counsel), for complainant.

*Merriam, Yerkes & Simons,* for defendants.

STONE, J. In this cause the bill of complaint was filed by Rose Hannah Brooks, in her own right, as mother, and as administratrix of the estate of William McConville, deceased, to set aside certain transfers of real estate and personal property made by him, about two months before his death, to his brother, the defendant John McConville. The grounds alleged in the bill for setting aside such transfers were two: (1) A weakened mental condition, brought about *(a)* by the excessive use of liquor resulting in frequent intoxication, and *(b)* a severe beating on the head a short time before his death; (2) the exercise of wrongful and undue influence over the mind of William McConville by the defendants, and threats and falsehoods, by which they, the defendants, induced

William McConville to make the transfers complained
of, while he was in such weakened mental condition.
The answer of defendant John McConville denies that
William McConville was a hard drinker and often in-
toxicated, and denies that he was in a weakened mental ·
condition, and avers that up to within a very few days
before his death he was a man of strong mentality,
and in full possession of all his faculties; denies that
he was severely beaten about the head a short time
before his death, and avers that the only time he was
ever beaten was some two years prior to his death,
and then not severely, and that he suffered no perma-
nent ill effects therefrom.   (2) The answers deny
that any threats were made, or falsehoods were told
to William McConville by defendants, or either of
them, or that any undue or wrongful influence was
exerted by defendants, or either of them, over the
mind of William McConville.

The answer of the defendant Delia McConville de-
nied, substantially, the allegations of the bill as above
stated, and denied any wrongdoing on her part.  This
answer is not printed in the record, and we have had
to refer to the original returns to ascertain its con-
tents.  The answer of the defendant John McConville
claims the benefit of a cross-bill, alleging that, as to
a certain loan made to Harry M. Baxter and A. William
Baxter, on which William McConville had taken a
deed and given back a land contract on certain real
estate, he (William McConville) had not only assigned
the land contract, but had executed a deed to John Mc-
Conville of the premises covered by the land contract,
which had been lost or mislaid, and prayed for affirma-
tive relief, and that a deed be given him in place of
the one lost or destroyed.

By reason of the death of the complainant, Rose
Hannah Brooks, subsequent to the entry of the decree
in the court below, the proceedings were revived in the

name of Robert Keller, administrator *do bonis non* of the estate of William McConville, deceased. Rose Hannah Brooks left a will, a certified copy of which, by stipulation, has been filed in this court and made a part of the record. By the terms of this will she left all her property, including the proceeds of this litigation, if any, to her four daughters, each of whom testified as a witness for the complainant in this cause.

William McConville died February 14, 1910, at the age of 45, unmarried, leaving as surviving relatives Mrs. Brooks, his mother, James McConville and John McConville, brothers, and Mrs. Keller, the wife of the administrator, Mrs. Maroney, Mrs. Morgan, and Mrs. Pierson, sisters. Defendant Delia McConville is the wife of John McConville. Up to a few weeks before his death William McConville had been engaged with his brother John, one of the defendants herein, in the retail grocery and meat business at 915 Fourth avenue in the city of Detroit. The brothers had been in this business for a number of years, a partnership having been formed between James, an older brother, and John and William in 1883. John was then 21 years old and William 18. James withdrew from the firm about 11 years before William's death, and from that time up to the time when William was forced, through physical incapacity due to his last illness, to retire, the business had been conducted by John and William as equal partners. The three brothers lived together for some time over the store, keeping what might be termed "bachelors' hall." John finally got married, and James lived with defendants and William six or seven years, and then got a room down town. William lived on with the two defendants until he died. The relations between the three brothers had always been of a close and intimate nature.

The same friendly relations did not exist between the brothers and their mother, the original complainant. The testimony shows a very unfortunate and un-

happy condition existing between them. The mother testified upon the hearing that she had not spoken to William for 18 years prior to his death, although, with the exception of 3 years, they had lived in the same city. She had married a second time. At the time of her marriage to Mr. Brooks she removed from the building above the grocery store, where she had lived with the sons a number of years, and after that time lived apart from them, living with her daughter Mrs. Keller during the last years of her life. When she married Mr. Brooks she took all of the furniture from the house, and the brothers, after a day or two, got some furniture and lived alone together until John's marriage.

William McConville began to fail in health in the spring of 1909. At that time he suffered from what was diagnosed by Dr. Grimes as a rectal fistula. Later on tuberculosis developed, and this was the cause of his death. The deceased was a man of some means. On December 14 and 15, 1909, while confined to his room, and realizing that he was about to die, he executed several instruments, designed to transfer and convey to his brother John practically all of his property, real and personal; and it was to set aside these transfers that the bill of complaint was filed in this cause.

Upon the hearing in the court below, at the close of voluminous testimony, the trial judge dismissed the bill of complaint upon its merits, and granted the relief prayed for in the cross-bill. The complainant has appealed. The position of complainant is: (1) That these several assignments and conveyances must be sustained as gifts *inter vivos*, if they can be sustained at all; (2) that William McConville did not intend to make an absolute gift of all his property to John McConville, did not understand that such was the legal effect of his acts, and had the intention only of putting his estate beyond the reach of an imaginary claim on

behalf of his former physician, one Dr. Grimes, and that the transactions lacked the element or intent to make a gift, and are therefore not sustainable as such; (3) that defendants took advantage of William McConville's mental and bodily weakness,.of his delusion relative to Dr. Grimes, and of the opportunity offered by his residence with them, to influence him to execute the instruments conveying title to John McConville; (4) that as to the assignment by William McConville of his interest as vendor in the land contract without the execution of a conveyance sufficient to pass the legal title to the land covered thereby, it was not sufficient to constitute a gift of land, and that there was no evidence whatever that any conveyance of said land was ever executed.

It is the contention of appellees: that complainant by the evidence offered failed utterly to sustain any of the material allegations of the bill of complaint; that there was no evidence worthy of consideration tending to establish, either that William McConville, at the time of the making of the transfers of property, was mentally incompetent, and that such mental incompetency was brought on by the excessive use of intoxicating liquor, or by a severe beating on the head a short time before his death; that the evidence wholly fails to show the exercise of any wrongful or undue influence over the mind of William McConville by either of the defendants; fails to show any threats or falsehoods by which they, the defendants, induced William McConville to make the transfers complained of while he was in such weakened mental condition; and they assert that the great weight of the evidence shows that deceased was mentally competent to dispose of his property when he made the transfers thereof.

We do not think it profitable to set out any considerable portion of the testimony in this case. We

have carefully read the record, which contains over 130 pages of printed testimony, and have reached the conclusion that the material allegations of the bill, in the points relied upon by complainant, have not been sustained by the evidence. We are satisfied that the equities of the case are with the defendants, and that the complainant has wholly failed to make a case for equitable relief; and we think that the circuit judge was fully justified in holding that the relief prayed for in the bill should be denied. We find no evidence to support the claim that deceased made the transfers in question to defeat a claim of Dr. Grimes amounting to less than $100.

The subject-matter involved in this controversy may be classed under two heads:

**I. Personal Estate.** *(a)* The personal property of the deceased, consisting of his personal effects, clothing, jewelry, and the like.

Under this head the instrument executed by William McConville was upon a paper bearing the letterhead of the firm, which appears to have been prepared by John McConville, and was as follows:

"OFFICE OF MCCONVILLE BROS.,
"DEALERS IN GROCERIES, FRESH AND SALT MEATS, VEGETABLES AND POULTRY,
"COR. FOURTH AND WARREN AVES.
"DETROIT, MICH., DEC. 15, 1909.
"I, William McConville, do this day sell to John McConville all my personal effects, consisting of clothing and jewelry, for $5.00, five dollars, and other good and valuable considerations paid me in hand this fifteenth day of December, nineteen hundred and nine.
"WM. MCCONVILLE.
"Witness:
"H. O. ROUNDS.
"JAMES F. CLARK."

*(b)* His half interest in the grocery business conducted under the name of McConville Bros. This was evidenced by an instrument prepared by the witness

Franklin P. Monfort, and signed by William McConville, as follows:

"Know all men by these presents, that in consideration of one dollar and other good and valuable considerations, the receipt of which is hereby acknowledged, I do hereby grant, sell, transfer and deliver unto John McConville, his heirs, executors, administrators and assigns, my undivided entire interest in the firm of McConville Brothers, the grantor and grantee named herein, located and doing business at No. 915 Fourth avenue, in the city of Detroit, county of Wayne and State of Michigan, consisting of merchandise, book accounts, etc. To have and to hold all and singular the said goods and chattels forever; and the said grantor hereby covenants with said grantee that he is the lawful owner of said goods and chattels; that they are free from all incumbrances; that he has good right to sell the same as aforesaid; and that he will warrant and defend the same against all lawful claims and demands of all persons whomsoever.

"In witness whereof I have hereunto set my hand and seal this 14th day of December, A. D. 1909.

"WM. MCCONVILLE. · [Seal.]

"In presence of
"FRANKLIN P. MONFORT.
"H. O. ROUNDS."

(c) The assignment of land contract bearing date the 10th day of September, 1908, between William McConville of the first part, and Harry M. Baxter and A. William Baxter, parties of the second part, covering certain real estate in the city of Detroit, upon which there was unpaid of purchase money, on December 14, 1909, about the sum of $3,900.

The assignment of this instrument was evidenced by a paper writing prepared by said Monfort, and signed by William McConville, in the following language:

"Know all men by these presents, that I, William McConville, of the city of Detroit, county of Wayne and State of Michigan, do hereby sell, assign, transfer and set over unto John McConville, of the same place,

all my right, title and interest in the land contract hereto annexed, for and in consideration of the sum of one dollar and other good and valuable considerations to me in hand paid.

"In witness whereof I have hereunto set my hand and seal this 14th day of December, nineteen hundred and nine.

"WM. McCONVILLE.          [Seal.]

"In presence of
    "FRANKLIN P. MONFORT.
    "H. O. ROUNDS."

 (d) The savings account in the Michigan Savings Bank. This money was transferred to the account of John McConville on or about December 15th.

**II. Real Estate.** This consisted of three parcels of land that were held by William McConville and John McConville as tenants in common. The conveyance of this real estate is evidenced by a quitclaim deed in the usual form, purporting to have been made, acknowledged and executed by William McConville, and duly witnessed by F. P. Monfort and H. O. Rounds on the 15th day of December, 1909, in consideration of the sum of $1 and other valuable considerations, which deed was duly recorded on the day of its execution.

Appellant's counsel claims that the transactions involved, if valid, were absolute transfers, divested William McConville of dominion over his property, and amounted to gifts *inter vivos*. We assent to this, and are of the opinion that the gifts were all of that nature, and a careful examination of this record convinces us that William McConville, while in the exercise of a full understanding, and in complete possession of his mental faculties, seized of a mortal illness, and knowing that he must die, carefully and deliberately undertook to give to his brother John, his nearest and closest friend, all of his property; that he took such measures in the execution of his desire as to fulfill the requirements necessary to sustain a

gift *inter vivos,* and as to the personal property, the transfers might be sustained, either as gifts *inter vivos* or *causa mortis;* nor do we deem that this position is at all inconsistent. Generally speaking, a gift *inter vivos* is a gift made by one person to another without the inducement or the apprehension of death. A gift made in anticipation of death, but not conditioned upon that event, is a gift *inter vivos,* and not a gift *causa mortis.* Moreover, a gift made with the intent that it shall take effect immediately and irrevocably, and fully executed by a complete and unconditional delivery, is good and valid as a gift *inter vivos,* although at the time the donor is *in extremis,* and dies soon after. 14 Am. & Eng. Enc. Law (2d Ed.), pp. 1014-1053, and cases cited; *Henschel* v. *Maurer,* 69 Wis. 576 (34 N. W. 926, 2 Am. St. Rep. 757). In this case, Cassoday, J., speaking for the supreme court of Wisconsin, said:

"Where a gift of personal property is made with intent to take effect immediately and irrevocably, and is fully executed by complete and unconditional delivery, it is certainly binding upon the donor as a gift *inter vivos,* and even if the donor at the time is *in extremis* and dies soon after" (citing cases).

See, also, *Dresser* v. *Dresser,* 46 Me. 48; *Gilligan* v. *Lord,* 51 Conn. 562.

An element necessarily present to uphold the validity of both classes of gifts is a delivery of the subject-matter, actual or constructive, or symbolical, in some cases.

Another instrument was introduced in evidence bearing date Detroit, Mich., December 18, 1909, upon the letterhead of McConville Bros. That instrument reads as follows:

"Jack, it is my wish when things are straightened out, and you are to take your own time about it, that you make these gifts as follows, or as you see fit:

Mother fifty dollars. Mrs. John McConville, one thousand dollars, my watch charm and diamond ring and a pair of shoes. Brother James, five hundred dollars. Sisters $25.00, twenty-five dollars each. All nieces and nephews, $10.00, ten dollars each. Peter's and Fred's wives, $25.00, twenty-five dollars.

"This is my last and only wishes of the way I wish my earthly possessions divided.

                                    "WM. MCCONVILLE.

"Father Griffin (paid) fifty dollars. (Line drawn through.)

"Pay all just debts and use your own judgment for the balance, if any.

                                    "WM. MCCONVILLE.
                                    "CHARLES S. FENWICK.
                                    "MARY R. FENWICK."

It is the contention of appellant that this instrument negatives the idea that here was an absolute, irrevocable gift made on the 14th and 15th days of December, and our attention has been called to the cases of *Trabbic* v. *Trabbic,* 142 Mich. 387 (105 N. W. 876) ; *Hagerman* v. *Wigent,* 108 Mich. 192 (65 N. W. 756), and *Holmes* v. *McDonald,* 119 Mich. 563 (78 N. W. 647, 75 Am. St. Rep. 430), in support of that position.

In *Trabbic* v. *Trabbic* the bill was filed by the widow, a second wife; she had married Peter Trabbic, who was at the time a widower with nine children. Mr. Trabbic owned a mortgage for $5,600, executed by one Dusseau. Before the death of Mr. Trabbic he sent one of his sons to Mr. Dusseau. He desired to divide the mortgage among his sons. He sent for a scrivener and directed that the old mortgage be discharged, for which purpose he gave the son power of attorney, and directed that a new mortgage be taken direct to defendant. This was done. He gave verbal instructions to the defendant to divide the amount of this mortgage, when it was paid, among his sons in equal shares. The executor having refused to inventory it as one of the assets of the estate, complainant filed her

bill alleging mental incompetency, etc. This court held that the discharge of this mortgage, and the execution of another at his request, was not testamentary in character; that it disposed of the absolute title to the mortgage to his son, the defendant, whom he was willing to trust to carry out his wishes in dividing it among certain children. This court held that he might have assigned direct to the son, and the same result would have followed, or he might have converted it into money, giving that to the defendant, either absolutely, or in trust for others, and that the transaction constituted a complete gift *inter vivos* and was valid.

In *Hagerman* v. *Wigent* it was held that the delivery of a mortgage by its owner to one person, with instructions to deliver the same to another after the owner's death, was a sufficient delivery to meet the requirements of a valid gift *inter vivos*.

In *Holmes* v. *McDonald,* Alexander McDonald took a purchase-money mortgage from his sons John and Donald for $3,000, with annual interest to be paid to the mortgagee during his lifetime, and after his death the sum of $500 to their sister, Jennie, "then these presents shall cease and be null and void." This mortgage was duly recorded. Later a new arrangement was made, and this mortgage discharged, and a new mortgage made cutting out Jennie. During the lifetime of Alexander his sons continued to pay him the interest specified in the mortgage. After his death the daughter, Jennie, filed her bill to foreclose the first mortgage, claiming that there was due her thereunder $500, and that Alexander McDonald had no power to discharge this mortgage and cut off the payment secured to her thereunder. The court below entered a decree of foreclosure in her favor, holding that the case was ruled by *Love* v. *Francis,* 63 Mich. 181 (29 N. W. 843, 6 Am. St. Rep. 290), and that the recording of the mortgage providing for the payment to Jennie of $500

was a gift *inter vivos*. That decree was affirmed in this court. This court said:

"To consummate such gift, there must be such a delivery from the donor to the donee as will place the property within the dominion and control of the latter, with intent to transfer the title to him"—

And held that a gift beneficial to the donee will be presumed to have been accepted.

It may be said that there are two answers to the claim of complainant with reference to this last-quoted paper, either of which it seems to us is conclusive:

It may be said that the gift had really been made to John and accepted by him; and, under the rule stated in *Holmes* v. *McDonald,* nothing remained to be disposed of by William, and that the instrument last above quoted is a mere expression of a wish as stated by him in the instrument. It says, "It is my wish that you make these gifts," etc., thus leaving it optional with the defendant John.

(2) Although the paper bears date December 18th, and may have been written even at a later date, yet according to the testimony of James McConville, and that of defendant John McConville, not objected to, it seems to have expressed in substance what had been written upon the margin of a newspaper, either by William, or in his presence, at the time of the execution of the papers of December 14th and 15th, and may be said to be a part of the same transaction. In our opinion this is the true interpretation that should be placed upon the instrument.

It is conceded by complainant's counsel, in his supplemental brief, that where a gift is made to one, and at the time of delivery and passage of title a condition is imposed upon the donee with respect to his use of all or a part of the donation, a trust is created, and the donee takes the property subject to the condition so expressed. But he contends that no trust is created

unless the condition upon which it is based is clearly expressed at the time title to the property passes. This is true probably.

**As to the relief prayed for in defendant John McConville's cross-bill.**—Before his death William had loaned to Harry M. Baxter and A. William Baxter a sum of money. For security therefor he had taken a deed of certain real estate from them, and had given back the land contract referred to. Under the repeated decisions of this court, in such a transaction, the deed and contract together constituted a mortgage. It was mere security held by William. Clearly, under our decisions, such an instrument was personal property and would pass by an assignment. This court said in *Clay* v. *Layton,* 134 Mich. 317 (96 N. W. 458), speaking of decedent's disposition of property:

"Had he seen fit during his life to deliver the deeds and assignments to those for whom they were intended, the title would have passed, and they would have become valid gifts."

We are inclined to think, however, that this question as to the nature of this instrument is not controlling in this case, and that the decree granting relief on the cross-bill was proper. The witness Monfort, who drew all of the instruments above referred to, except the first and last, and who witnessed them, testified, after a lengthy cross-examination, that it was his best recollection and belief that he drew another paper, to wit, a deed from William to John of the property covered by the land contract. It is true he is not very definite or positive in his testimony upon this subject, but there is no evidnce to the contrary. It also appears by the testimony of the witness Harry M. Baxter that in the month of December, when he went to pay William some money upon the land contract, while William was in his sick room, the latter said to him that he had transferred this property to his brother John, and that the money should be paid to John.

It is a well-settled doctrine that subsequent declarations of the donor, in the nature of admissions against interest, are admissible in evidence as tending to show that he had given the property in question to the donee. 20 Cyc. p. 1247, and note; *Darland* v. *Taylor*, 52 Iowa, 503 (3 N. W. 510, 35 Am. Rep. 285) ; *Smith* v. *Maine*, 25 Barb. (N. Y.) 33; *Garrison* v. *Trust Co.*, 164 Mich. 345 (129 N. W. 691, 32 L. R. A. [N. S.] 219).

We have so recently passed upon the subjects of gifts *inter vivos* and gifts *causa mortis* that we do not deem it necessary to review all of the authorities cited by counsel. *Union Trust & Savings Bank* v. *Tyler*, 161 Mich. 561 (126 N. W. 713, 137 Am. St. Rep. 523) ; *Shepard* v. *Shepard*, 164 Mich. 183 (129 N. W. 201) ; *In re Morse's Estate*, 170 Mich. 114 (135 N. W. 1057) ; *Price* v. *Hagle*, 171 Mich. 455 (137 N. W. 253).

In the last-cited case this court held that the mere fact that a decedent so disposed of his property by deed as to do an apparent injustice to one of his relatives will not nullify the transaction. Courts are not permitted to make equitable distribution of estates, but are concerned only in giving effect to the legal acts of decedents.

Perhaps it may seem hard and unnatural that the mother was not provided for more generously by William, but a careful study of the record in this case discloses the reason why. Not only William, but his brothers, considered that their mother had been an unnatural mother, and had not been fair with them, and this estrangement was of long standing. That the entire property of William, of the value of about $10,000, should have been given by him to his brother John, his best friend and partner, seems natural under the circumstances. They had made their money together. He was unmarried and without issue. The defendant John and his wife had provided him a home,

and, it is conceded, had cared for him properly and affectionately during their residence together, and down to the date of his death.

We are satisfied that the circuit judge reached the right conclusion, and the decree of the circuit court is affirmed, with costs to defendants.

STEERE, C. J., and MOORE, MCALVAY, BROOKE, KUHN, OSTRANDER, and BIRD, JJ., concurred.